**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190630-U

Order filed December 8, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0630 Circuit No. 17-CF-613 |
| ANTHONY S. CREASY, | ) ) ) | |
| Defendant-Appellant. | ) ) | Honorable Daniel L. Kennedy, Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice McDade and Justice Daugherity concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) The State proved defendant's guilt beyond a reasonable doubt; (2) the court properly allowed evidence of defendant's prior bad acts and the jury instruction on this issue did not constitute reversible error; (3) the State did not make improper comments during closing and rebuttal arguments; (4) the victim's mother's testimony did not amount to perjury; (5) defense counsel did not provide ineffective assistance; (6) there is no cumulative error; and (7) the court did not abuse its discretion at sentencing.

¶ 2     Defendant, Anthony S. Creasy, appeals his convictions and sentences for predatory criminal sexual assault of a child. He raises the following issues: (1) the sufficiency of the

evidence; (2) the admissibility and the jury instructions related to prior bad acts evidence; (3) the propriety of the State's comments during closing and rebuttal arguments; (4) the victim's mother's alleged perjured testimony; (5) defense counsel's effectiveness; (6) cumulative error; and (7) the propriety of his sentences. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with four counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2016)). Each count alleged defendant committed the offense by placing his penis in the victim V.M.'s mouth. Each count corresponded to a different time period. Count I alleged the act occurred between January 1, 2009, and June 1, 2011. Count II alleged the act occurred between June 2, 2011, and June 1, 2012. Count III alleged the act occurred between June 2, 2012, and June 1, 2013. Count IV alleged the act occurred between June 2, 2013, and December 31, 2014.

¶ 5        The State filed a pretrial motion *in limine*, which sought to admit evidence of other allegations made against defendant. The State sought to introduce evidence that defendant had committed similar bad acts to a different victim, C.P., in Wisconsin.  The State sought the admission of those acts to show defendant's propensity as a sex offender pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2016)). In the alternative, the State sought to have the other bad acts evidence admitted under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) to show defendant's "motive, intent, absence of mistake, a continuing narrative of events, rebut a defense, and establish defendant's *modus operandi*."

¶ 6        The court held a hearing on the State's motion *in limine*. After hearing the arguments of the parties, and over defendant's objection, the trial court stated, "I will grant the State's motion in limine based on the case law that has been provided to me." Defense counsel asked the court if

it considered whether the prejudicial value of the evidence outweighed its probative value. The court responded, "Yes. I didn't find that final prong of the test."

¶ 7      The cause proceeded to a jury trial. The victim, V.M., testified. She provided her date of birth as April 1, 2002. She identified defendant in open court. She met defendant for the first time when she was six years old. Her mother Ashley P. dated defendant on-and-off over the next six years. V.M., her mother, and defendant lived in the same home at times during that period. Defendant would babysit her even at times when her mother and defendant were not dating and living separately. V.M. viewed defendant as a father figure.

¶ 8      When V.M. was about seven or eight years old (around 2009 and 2010), she, her mother, and defendant lived in a home together in Joliet. V.M. and defendant were using two different computers in the same room. V.M. noticed defendant playing with something. She thought it was a "toy mushroom."

¶ 9      About two weeks later, she did her homework in the kitchen. When she finished, she went to the computer room to have defendant check her homework. She walked in the room and observed defendant masturbating to pornography. Defendant acted surprised when she walked in, but he eventually explained what was happening in the videos. He told V.M. that he wanted her to do the things in the videos. He explained how to give "blow jobs." He asked her to do it, which she eventually did.

¶ 10      According to V.M., defendant would ask her to give him a "hand job" or "blow job" frequently. She would perform the acts almost "[e]very day, every other day." She described the acts and stated that they either occurred in the computer room or bedroom of the home. The events occurred during the day when her mother was not home. It also happened at night when defendant

- 3 -

would put her to bed. V.M. did not tell her mother what happened between her and defendant until after the incidents stopped.

¶ 11	In fourth grade (2011 to 2012), V.M. and her mother moved into her mother's friend's home. V.M. was about 8 to 10 years old at the time. Defendant did not live with them, but V.M. and defendant stayed in contact. Defendant would visit the home and would ask V.M. for "hand jobs" and "blow jobs," which she performed. V.M. also stated that defendant touched her vagina and breasts during this period.

¶ 12	Sometime between fourth and fifth grade, V.M. and her mother moved back in with defendant. She was about 10 to 11 years old at the time. Defendant continued to have V.M. perform sexual acts with him. He also placed his penis in her vagina for the first time during this period. The sexual incidents occurred "[e]very day, every other day" while they lived together.

¶ 13	In sixth grade, when V.M. was approximately 11 to 13 years old, she and her mother moved back in with her mother's friend. V.M. continued seeing defendant about once a week during this period. Defendant continued to engage in sexual acts when he saw V.M.

¶ 14	The same year V.M. and her mother moved back in with defendant. The sexual encounters continued to occur with defendant. She began getting her menstrual cycle at this time, so defendant started using condoms when they had sexual intercourse. She continued to perform oral sex on defendant. She performed oral sex on defendant in his car multiple times. During these incidents, defendant told V.M. he wanted to be a "better dad" and would stop the sexual contact. She said the acts of oral sex and intercourse occurred more times than she could count.

¶ 15	At trial, V.M. described defendant's penis. She indicated that his penis had a silver ring piercing. V.M. was shown a picture of a penis with a piercing and said that it was defendant's penis.

¶ 16 Ashley and defendant broke up when V.M. was in sixth grade. V.M. was on good terms with defendant after he ended the relationship with her mom. Although V.M. never told her mom about the incidents before, she eventually told her mom when she learned that defendant was living with young girls that were around her age when defendant began engaging in sexual activities with her. V.M. was worried that defendant would do the same things to those girls.

¶ 17 On cross-examination, V.M. testified that she did not know that what defendant made her do was inappropriate. She added that there were occasions when defendant would join her in the shower. She told her grandmother about defendant helping her wash in the shower. Her grandmother told her that it was not okay for him to do that, and to tell her if he did it again. V.M. never told her grandmother about her other sexual encounters with defendant.

¶ 18 According to V.M., defendant used his cell phone to record and take pictures of some of their sexual encounters. She did not know what happened to his cell phone, but she thought it had been stolen. When defendant used a condom during intercourse, she would throw it away after. She did not think to show the condom to anyone because she did not know that what she and defendant did was inappropriate.

¶ 19 In seventh grade, V.M. told her friend about her encounters with defendant. Her friend told her that what defendant was doing was wrong. Her friend did not tell anyone else what V.M. told her. After that conversation, V.M. still did not tell her mother. A few years later, V.M. told her cousin. Her cousin told her to tell her mother. About a month after her conversation with her cousin, V.M. told her mother.

¶ 20 V.M.'s mother Ashley testified that she dated defendant on-and-off from around 2008 to 2014. She described the relationship between defendant and V.M. as "pretty good." She left V.M. alone with defendant numerous times and did not have any reason to believe that defendant was

untrustworthy. Ashley identified the same picture shown to V.M. as a picture of defendant's penis with a piercing.

¶ 21 Ashley did have access to defendant's cell phone. She did not find any inappropriate pictures or videos of V.M. on the phone.

¶ 22 In 2017, V.M. came to her with the allegations against defendant. Defendant lived in Wisconsin at the time. She called defendant the same day to confront him with V.M.'s allegations. The following colloquy occurred:

> "Q: And at what point—did you reach out to [defendant] at all?
>
> A: I did, the day that [V.M.] told me I called him.
>
> ***
>
> Q: Okay. And isn't it true that when you spoke to [defendant], he completely denied these allegations?
>
> A: No, that's not true."

¶ 23 Ashley also called defendant's mother and sister regarding the allegations. She spoke with them because defendant did not deny the allegations when she confronted him.

¶ 24 On redirect examination, the State asked Ashley, "When you called defendant, you said he did not deny this, right?" Ashley answered, "No, he didn't." On recross examination, the defense asked Ashley if defendant ever admitted to the allegations, and she answered, "No, he didn't."

¶ 25 The parties stipulated to C.P.'s testimony. The stipulation provided:

> "[I]f [C.P.] were to testify in person, her testimony would be as follows: That [C.P.] is the stepdaughter of the defendant through his marriage to [her] mother, N.P., and she refers to [defendant] as dad.

And that [C.P.]'s date of birth is August 2, 2007; and that in December of 2015 when [C.P.] was eight years old, she was living with her mother and the defendant in DePue, Illinois; and that at the beginning of that month, the defendant pulled down [C.P.]'s pants and touched her private with his bare hands while in their living room, and the month was also the start of the defendant giving [C.P.] candy, such as gummy bears, gummy worms, Hershey's chocolate and Reese's for sucking his [penis]; and that there were numerous other occasions when they lived in [DePue], Illinois and when they moved to Coon Valley, Wisconsin that the defendant had [C.P.] suck his [penis] and move her hand up and down on his penis until cum would come out of his little hole and go into his hand. Then he would go flush it in the bathroom, and that defendant would urge her to swallow his cum.

And that the defendant taught her the word cum and [penis], and that he was the only one she ever discussed sexual things with. And that he told her not to tell anyone about her sucking his [penis] because they wouldn't have a house to live in, he wouldn't be her dad anymore, and that he would be arrested and put in an orange jump suit.

And the defendant showed her pornographic videos on his cell phone, which showed teenagers in the videos depicting the children perform oral sex, two of which [C.P.] recalls being titled teenager's first time sucking cock and four-year-old first time sucking cock.

And that while living with him in Coon Valley, Wisconsin, the sexual acts would take place throughout the house, in the living room, bathroom, her old bedroom and his office.

And the last time he made her suck his [penis] was in December of 2016 between Christmas and New Year's when [C.P.] was nine years old, and the defendant had brownish/blackish hair and a small gray ring on his penis.

And that when [C.P.] said she wanted to stop, the defendant told her he'd just move on and start doing with her younger sister *** to which she responded, fine, I'll do it, but I won't swallow the cum. And the defendant told [C.P.] that her mom did it but not enough."

¶ 26    After reading the stipulation, the State rested. Defendant chose not to testify.

¶ 27    During the State's closing argument, it noted that defendant did not deny the accusations when Ashley confronted him. The State noted the reason why V.M. finally came forward with her allegations because "that stipulation between the People of the State of Illinois and that defendant, that when his stepdaughter was eight years old, he began to sexually abuse her." As to the stipulation, the State added, "he is not on trial for that. And you are not to consider that for any other purpose other than those which were instructed or will be instructed to you by this judge, which is intent, motive, design, propensity, and a continuing narrative of events."

¶ 28    In response, the defense highlighted the lack of physical evidence in the case. The defense acknowledged that Ashley testified that defendant did not deny the accusation. However, the defense argued that defendant never admitted the allegations.

¶ 29    In rebuttal, the State reiterated the elements of the offenses and the evidence at trial. The State also argued:

> "[V.M.] came forward because she knew [defendant] had two stepdaughters that she did not want to approach the age where it started happening to her. And guess what? That girl that was on the stand, that girl told you everything, pretty smart girl. Because guess what? It already had. That's what the stipulation was. The stipulation between the parties that this girl would testify to this, we both agreed."

¶ 30    After arguments, the trial court provided the jury with its instructions. In relevant part, the court instructed the jury:

> "Evidence has been received that the defendant has been involved in offenses other than those charged in the indictment. This evidence has been received on the issues of the defendant's intent, motive, design, continuing narrative of events and propensity, and may be considered by you only for that limited purpose."

¶ 31    Ultimately, the jury found defendant guilty of all four counts of predatory criminal sexual assault of a child.

¶ 32    Defendant filed a posttrial motion. The motion argued the following errors occurred at trial: (1) the trial court erred in allowing C.P.'s stipulated testimony to establish defendant's propensity, motive, and intent; (2) the trial court erred in instructing the jury on how it should consider C.P.'s stipulated testimony; (3) the State made improper closing and rebuttal arguments; and (4) the State failed to prove defendant's guilt beyond a reasonable doubt.

¶ 33    In addition, defendant's motion argued that his trial counsel provided ineffective assistance for failing to "insert exculpatory evidence in" C.P.'s stipulated testimony. Specifically, defendant contended that counsel should have also included several facts surrounding C.P.'s allegation in her stipulation. Those facts include: (1) defendant denied the allegation when confronted; (2) C.P.'s mother Natasha reported being skeptical of C.P.'s allegations but knew she had to report it to protect her children; (3) C.P. thought the allegations were funny and made a comment about her mother "getting rid of one dad so what was one more"; (4) a roommate lived with Natasha and defendant that was always home and never reported anything; (5) after making her allegation, C.P. made comments that defendant did not do it and it was "the other guy"; (6) Natasha confirmed C.P. likely would have overheard her and defendant fighting about the allegations in Illinois; (7) Natasha confirmed C.P. had access to defendant's cell phone and knew how to use it; (8) Natasha confirmed pornography and nude pictures of defendant may have been on her phone; (9) Natasha was skeptical of the allegations because she was unable to think about a time when she left her daughters alone with defendant; and (10) C.P. once walked in on her uncle and another woman watching pornography. Defendant supported these allegations with various written police reports and his Wisconsin attorney's investigative reports.

¶ 34    Defendant's motion also claimed that Ashley made a false statement at trial when she testified that defendant did not deny V.M.'s allegations when she initially confronted him. Defendant argued that the State failed to exercise due diligence in obtaining text messages between he and Ashley in which he denied V.M.'s allegations. According to defendant, the State received discovery from the case in Wisconsin. Although the specific text message exchange between defendant and Ashley was not part of the discovery, the documents in the discovery referenced how police obtained defendant's phone and text message history. Defendant claimed that if the

State exercised due diligence in obtaining those text messages, it could have corrected Ashley's testimony at trial that defendant never denied V.M.'s allegations. Attached to the motion are screen captured images of text messages defendant claimed he and Ashley exchanged when she confronted him about V.M.'s allegations:

"[Ashley]: Answer your phone. It's an emergency [ Feb. 19, 2017, 10:19 PM].

[Ashley]: Make sure you tell your wife you're a fucking CHILD MOLESTER I would hate to see you fuck up her girls the way you fucked up [V.M.]. You are so lucky you are out of state. Be sure I will be talking to the police to see if I can press charges against you. I also already talked to your mother and told her what [V.M.] said. [Feb. 19, 2017, 10:40 PM].

[Defendant]: I'm not sure if you hung up or if we simply got disconnected. [Feb. 20, 2017, 12:38 AM].[1]

[Ashley]: I hung up. She said you took a picture and a video of it [defendant]. I absolutely believe her and I think you are a fucking liar. [Feb. 20, 2017, 12:47 AM]

[Defendant]: I understand. She is your daughter. I would believe my child too. Any parent should. I don't know what to say. I don't know why she would say something like that now. But, no. [Feb. 20, 2017, 12:55 AM]"

¶ 35    Ultimately, the trial court denied defendant's posttrial motion.

---

[1]The screen capture of the messages shows that Ashley sent defendant a message prior to this response. However, that message is cut off in the image, and it is not known what Ashley said in that message.

¶ 36    The presentencing investigation report (PSI) showed that defendant was 36 years old. His only prior criminal record included a driving under the influence arrest for which he received court supervision. He had a stable residence and employment prior to his arrest. He had an associate degree in computer aided drafting and design. Defendant submitted character letters from his family and friends.

¶ 37    At the sentencing hearing, Ashley read her victim impact statement. She described defendant's acts as "devastating" to her family. V.M. had since become depressed and began "self-harming." V.M. now struggles in school and has difficulty creating normal friendships.

¶ 38    V.M. read her victim impact statement as well. Defendant's acts caused her depression and she struggled to pursue her passions. She struggled with anxiety and depression and had days where she "cannot function." She also had difficulty in school and had difficulty being around adult males. She believed she would start to heal after defendant was found guilty.

¶ 39    After hearing the parties' arguments at sentencing, the court found the "aggravating factors outweigh any mitigating factors." The court sentenced defendant to four consecutive terms of 21 years' imprisonment (84 years in total).

¶ 40                                II. ANALYSIS

¶ 41                          A. Sufficiency of the Evidence

¶ 42    First, we consider whether the evidence at trial proved beyond a reasonable doubt that defendant committed the four counts of predatory criminal sexual assault of a child. In reviewing a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In doing so, we are mindful that "it is for the jury to weigh the credibility of the

witnesses and to resolve conflicts or inconsistencies in their testimony" (*People v. Frieberg*, 147 Ill. 2d 326, 360 (1992)), and it is not the function of this court to retry the defendant (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)). When a challenge to the sufficiency of the evidence is presented, all reasonable inferences from the record are drawn in favor of the prosecution. *Id.* We find the evidence viewed in the light most favorable to the prosecution supports the jury's verdict.

¶ 43     Here, defendant's challenge to the sufficiency of the evidence is limited to the credibility of V.M. At trial, V.M. provided consistent testimony as to countless acts of sexual assault defendant committed against her between 2009 and 2014. She testified that the abuse continued even while defendant lived in a separate location. She testified to her ages, years in school, and the locations of the abuses. This testimony alone, if credible, was sufficient to find defendant guilty of predatory criminal sexual assault of a child. Significantly, the jury found V.M. to be a credible witness.

¶ 44     While V.M.'s testimony alone, when viewed in the light most favorable to the State, is sufficient to affirm defendant's conviction, the record also contains evidence corroborating her testimony. She was also able to testify to the fact that defendant had a piercing and a silver ring on his penis. This is consistent with Ashley and C.P.'s testimony that defendant had a piercing on his penis. It is unlikely V.M. would have known this if defendant had not forced her to repeatedly perform sexual acts. Additionally, V.M.'s and C.P.'s descriptions of how defendant repeatedly abused them is nearly identical.

¶ 45     Defendant challenges V.M.'s credibility by calling our attention to the following facts: (1) V.M. reported showering with defendant to her grandmother, who told her it was wrong, yet V.M. made no mention of the sexual abuse; (2) defendant told her he wanted to stop the sexual encounters and be a better dad, but she still did not tell anyone; (3) V.M. told one of her friends

two years before she told her mother even though her friend told her the behavior was wrong; and (4) Ashley contradicted V.M.'s description of defendant having an indentation on his penis.

¶ 46    V.M. failing to immediately come forward with her allegations against defendant does not make her a less credible witness. Exposing a deeply personal traumatic experience is no easy task. In addition, while she and Ashley did not agree that defendant's penis had an indentation, they both identified the same photograph of defendant's penis at trial. The trier of fact had the opportunity to observe V.M. and hear her testimony. It was the trier of fact's role to resolve any inconsistencies in her testimony and determine the weight to be given. *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 59. Based on its verdict, the trier of fact found V.M. credible regardless of her delay in coming forward. We will not substitute our judgment on questions involving the credibility of a witness. *People v. Downin*, 357 Ill. App. 3d 193, 202 (2005).

¶ 47    Defendant also argues that V.M.'s testimony is not credible because the State failed to present any physical evidence to corroborate her testimony. Defendant surmises that there would be physical evidence if defendant engaged in countless sex acts with V.M. However, the lack of physical evidence of a sexual assault is not fatal to the State's case and is not required to prove the commission of a sex crime. See *People v. DuPree*, 161 Ill. App. 3d 951, 962 (1987).

¶ 48                                B. Prior Bad Acts Evidence

¶ 49    Next, defendant contends that the trial court erred when it allowed the State to introduce evidence of defendant's prior bad acts with C.P. This court will not overturn a decision to admit other-crimes evidence absent an abuse of discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). An abuse of discretion has occurred when the trial court's decision is arbitrary, fanciful, or unreasonable or when no reasonable person would take the position adopted by the trial court. *Id.*

¶ 50      For clarity, we note that the trial court granted the State's motion *in limine* on this issue under two grounds. First, to establish defendant's propensity under section 115-7.3. Second, the court allowed the evidence under Illinois Rule of Evidence 404(b) to show defendant's motive, intent, design, and a continuing narrative of events.

¶ 51      In general, evidence of other crimes is inadmissible to show propensity. See generally *People v. Smith*, 2015 IL App (4th) 130205, ¶ 21. Section 115-7.3 of the Code, however, provides an exception, permitting other-crimes evidence when the defendant is accused of predatory criminal sexual assault of a child. 725 ILCS 5/115-7.3(a)(1), (b) (West 2016). Such evidence is admissible and "may be considered for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b). The section further states, "[i]n weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider: (1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." *Id.* §115-7.3(c). Other-crimes evidence, upon meeting the initial statutory requirements, " 'is admissible if it is relevant and its probative value is not substantially outweighed by its prejudicial effect.' " *Smith*, 2015 IL App (4th) 130205, ¶ 21 (quoting *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 38).

¶ 52      Defendant contends that C.P.'s stipulated testimony should not have been admitted because those acts occurred after the incidents with V.M. There is no requirement that the other incident being offered in the other-crimes evidence occur prior to the charged offense. See *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 79; *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 48. " 'The term "other-crimes evidence" encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial.' " *Johnson*, 2020 IL

App (1st) 162332, ¶ 48 (quoting *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005)). As such, C.P.'s testimony was admissible even though it occurred after the incidents involving V.M.

¶ 53        Defendant does not otherwise challenge the admissibility of C.P.'s stipulated testimony as propensity evidence under section 115-7.3. Such an argument would be futile, given that the section 115-7.3 factors overwhelming favor admitting C.P.'s testimony as propensity evidence. There exists a close proximity in time between the two alleged assaults. Defendant stopped assaulting V.M. in the summer of 2014 when he and her mother ended their relationship. He then began a relationship with C.P.'s mother in 2015 and began abusing C.P. in December of 2015 through the end of 2016. The degree of factual similarity of the charged offense is almost identical to C.P.'s allegations. In both instances, defendant abused his position of trust as a father figure by showing the children pornography and forcing them to perform repeated acts of oral sex. As to other factors for consideration, it is also highly relevant that both girls were able to describe defendant's piercing on his penis.

¶ 54        Rather than challenging the admissibility of C.P.'s stipulated testimony as propensity evidence, defendant contends the court should not have allowed the evidence for other purposes under Rule 404, specifically, to show intent, motive, design, and continuing narrative of events. Evidence that is admissible under section 115-7.3 "may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2016). C.P.'s stipulated testimony was relevant to establish design and continuing narrative of events under Rule 404. As discussed above, C.P.'s testimony supports V.M.'s testimony in that it showed defendant engaged in a similar pattern of misconduct.

¶ 55        As to using C.P.'s stipulated evidence to establish motive and intent, the State concedes C.P.'s testimony should not have been admitted for this purpose. We agree. Evidence of other acts

of sexual misconduct with other children should not be admitted to show intent or motive when intent or motive are not contested. For example, in *People v. Bobo*, 278 Ill. App. 3d 130 (1996), the defendant took a female student into his office, moved his hand to her breast, attempted to kiss her against her violent protests, and then informed her that if she changed her mind, she knew where to find him. *Bobo* held that evidence of other sexual misconduct with students was unnecessary to show intent, guilty knowledge, accident, or absence of mistake because these factors were clearly shown by the testimony concerning the act itself. *Id.* at 133. Here, there was no question as to whether the acts happened accidentally or with the requisite intent if they happened at all. Thus, C.P.'s stipulated testimony should not have been admitted to establish defendant's motive or intent.

¶ 56        However, we find no error. Again, the evidence was already admissible for propensity, design, and continuing narrative of events purposes. Whether the evidence should have been inadmissible for intent and motive purposes would not change that result. The trial court also did not provide the jury with an admonishment prior to reading C.P.'s stipulated testimony. As such, the jury was not immediately informed how it should consider this evidence. Defendant never sought such an admonishment, nor does he argue that an admonishment was required. Therefore, we find no error in admitting C.P.'s stipulated testimony.

¶ 57        Defendant's claim is better reviewed under his challenge to the court's instruction to the jury on how to consider C.P.'s stipulated testimony. In particular, the court instructed the jury:

> "Evidence has been received that the defendant has been involved
> in offenses other than those charged in the indictment. This evidence has
> been received on the issues of the defendant's intent, motive, design,

continuing narrative of events and propensity, and may be considered by

you only for that limited purpose."

¶ 58    Defendant concedes that he failed to preserve his challenge to the jury instruction by failing to object at trial. To preserve an error for review, a party must object at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. If both actions do not occur, the defendant has forfeited the issue. *Id.* However, the plain-error doctrine allows review of unpreserved errors in two instances: whether the evidence is closely balanced, and the error threatens to tip the scales of justice against the defendant or the error was so serious that it threatened the fairness of the trial and the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant contends that this error satisfies the first prong of the plain-error doctrine because the evidence is closely balanced. Before this court may employ plain-error review, there must first be a clear and obvious error. *Id.*

¶ 59    As we have already found, C.P.'s stipulated testimony was admissible to establish defendant's propensity, design, and a continuing narrative of events. As such, the court did not err in including these in the jury instruction. But C.P.'s stipulated testimony should not have been admissible to establish defendant's motive and intent. Consequently, the court made a clear and obvious error by providing the jury with an overbroad instruction. Nevertheless, we find the evidence is not closely balanced. Therefore, the error is not reversible under the plain-error doctrine. That is, omitting "motive and intent" from the instruction would not have changed the result in this trial.

¶ 60    As discussed above, the evidence of defendant's guilt is overwhelming. V.M. provided detailed and credible testimony as to defendant's constant abuse. Defendant claims that the evidence is closely balanced because the State's case was based on the credibility of one witness.

However, Ashley and C.P. both corroborated V.M.'s testimony that defendant had a silver piercing on his penis. This fact would likely not be known by either C.P. or V.M. under normal circumstances. In addition, C.P.'s stipulated testimony provided an almost identical account of defendant's abuse. These strikingly similar accusations support V.M.'s testimony. Moreover, the overbreadth of the instruction could not possibly have prejudiced defendant. As intent and motive were never contested at trial, including these issues in the instruction was redundant. See *People v. Leaks*, 179 Ill. App. 3d 231, 241-42 (1989).

¶ 61                                  C. Closing Arguments

¶ 62        Defendant next contends the prosecutor made improper arguments at closing argument and went outside the scope during rebuttal argument. Defendant concedes that he failed to preserve this issue below but urges this court to consider the issue under the plain-error doctrine. To preserve errors made in closing arguments, the defendant must raise an objection both at trial and in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176 (1988). Where he fails to do so, the error is forfeited and will not be considered on review unless it rises to plain error. Ill. S. Ct. R. 615(a). Plain error may be found where the evidence of guilt is closely balanced or where the alleged error was seriously prejudicial and prevented the defendant from receiving a fair trial. *People v. Hudson*, 157 Ill. 2d 401 (1993).

¶ 63        Prosecutors are afforded wide latitude in closing arguments. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields. *People v. Pasch*, 152 Ill. 2d 133, 184 (1992). A reviewing court must ask whether the complained-of comments "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123.

¶ 64        Defendant first takes issue with the following prosecutor's remark at closing:

> "Remember why [V.M.] told you, and I told you she would, she would tell you why she finally came forward. And now you know, because you were just read that stipulation between the People of the State of Illinois and that defendant, when his stepdaughter was eight years old, he began to sexually abuse her."

In defendant's view, the prosecutor's statement, "explicitly argued that [defendant] admitted to the allegations in" C.P.'s stipulated testimony. Nowhere in this statement does the prosecutor claim that defendant admitted to C.P.'s allegations. The above statement needs to be reviewed in the context of the entire closing statement. The stipulation itself made clear, "if [C.P.] were called to testify in person her testimony would be as follows." The jury knew that the parties only stipulated to C.P.'s testimony. Her testimony did not include a statement that defendant admitted the allegations. The State emphasized this point in rebuttal when it argued that the stipulation related to what C.P. would testify to if she testified at trial. Nowhere in any of these statements is a claim that defendant admitted to the allegations. As such, the State did not commit any error in its closing arguments on this point.

¶ 65        Defendant next takes issue with the prosecutor's rebuttal argument. According to defendant, the prosecutor went outside the scope of the rebuttal argument by reiterating the arguments made in closing arguments and also reviewed the elements of the offenses. During the defense's closing argument, counsel emphasized the lack of physical evidence in the State's case. Counsel stated, "[t]he State knows that they don't have any evidence in this case." Counsel described V.M.'s testimony as "incredible" and that the State offered no evidence to "corroborate" V.M.'s testimony. Defendant's closing argument invited the State to reiterate the evidence present

at trial to establish that it proved each element of the offense beyond a reasonable doubt. See *People v. Vriner*, 74 Ill. 2d 329, 344 (1978) (defendant's counsel invited the complained-of statement by the prosecutor and cannot, therefore, rely on such statement as error). The State was free to restate the evidence, explain V.M.'s credibility, and note the corroborating evidence in response to the defense's closing argument. Consequently, we find no error in the State's rebuttal argument.

¶ 66                    D. Evidence of Defendant's Text Messages

¶ 67        Defendant contends that the screenshots of the text message exchange between he and Ashley proved that Ashley committed perjury at trial. Specifically, defendant claims the text messages show that defendant denied V.M.'s allegations when Ashley confronted him. Therefore, defendant argues Ashley perjured herself when she testified that defendant neither admitted nor denied V.M.'s accusations after she first confronted him over the phone.

¶ 68        The use of perjured testimony to obtain a criminal conviction violates due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). Even where the prosecution did not solicit false testimony, but allows it to go uncorrected when it appears, due process is violated. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A conviction obtained by the knowing use of perjured testimony, which reasonably could have affected the jury's verdict, will be set aside. *Olinger*, 176 Ill. 2d at 345.

¶ 69        As a threshold matter, defendant must demonstrate the text messages he attached to his posttrial motion establish Ashley made false statements during her trial testimony. The messages show the following exchange:

        "[Ashley]: Answer your phone. It's an emergency.

- 21 -

[Ashley]: Make sure you tell your wife you're a fucking CHILD MOLESTER I would hate to see you fuck up her girls the way you fucked up [V.M.]. You are so lucky you are out of state. Be sure I will be talking to the police to see if I can press charges against you. I also already talked to your mother and told her what [V.M.] said.

[Defendant]: I'm not sure if you hung up or if we simply got disconnected.

[Ashley]: I hung up. She said you took a picture and a video of it Tony. I absolutely believe her and I think you are a fucking liar.

[Defendant]: I understand. She is your daughter. I would believe my child too. Any parent should. I don't know what to say. I don't know why she would say something like that now. But, no."

¶ 70        Here, we find the messages do not show that Ashley made false statements in her trial testimony. None of the messages contain an explicit denial of V.M.'s allegations. The messages lack any context. Defendant's claim is completely speculative. There is no indication as to what Ashley thought defendant was lying about. Defendant's comment, "But, no" also does not constitute an explicit denial. At best, it constitutes him denying taking photographs and videos of V.M., but it does not constitute a denial of the allegations of acts of oral sex (the charged acts). Consequently, these messages do not affirmatively establish that Ashley made a false statement at trial.

¶ 71                    E. Ineffective Assistance of Counsel

¶ 72        Defendant contends defense counsel provided ineffective assistance for failing to include exculpatory evidence in C.P.'s stipulated testimony. Defendant claims that counsel should have

included the following evidence in the stipulation: (1) defendant denied the allegation when confronted; (2) C.P.'s mother Natasha reported being skeptical of C.P.'s allegations but knew she had to report it to protect her children; (3) C.P. thought the allegations were funny and made a comment about her mother "getting rid of one dad so what was one more"; (4) a roommate lived with Natasha and defendant that was always home and never reported anything; (5) after making her allegation, C.P. made comments that defendant did not do it and it was "the other guy"; (6) Natasha confirmed C.P. likely would have overheard her and defendant fighting about the allegations in Illinois; (7) Natasha confirmed C.P. had access to defendant's cell phone and knew how to use it; (8) Natasha confirmed pornography and nude pictures of defendant may have been on her phone; (9) Natasha was skeptical about the allegations because she was unable to think about a time when she left her daughters alone with defendant; and (10) C.P. once walked in on her uncle and another woman watching pornography.

¶ 73    Upon review, we find the record is insufficient to reach the merits of this claim. Instead, we hold that the issue is better suited for collateral review in a postconviction petition. The record before us includes no statements or explanations from trial counsel regarding this evidence. Consequently, we cannot ascertain counsel's opinion regarding this evidence or what efforts counsel made to have this evidence included in the stipulation. Given the incomplete record, we decline to reach the merits of this argument and instead leave the issue to be developed in a postconviction proceeding. See *People v. Veech*, 2017 IL 120649, ¶ 46.

¶ 74    Defendant also reframes three other claims of error as claims of ineffective assistance of counsel. Those three claims are that counsel provided ineffective assistance: (1) for failing to obtain and present the text messages between defendant and Ashley regarding his alleged denial of V.M.'s allegations (*supra* ¶¶ 67-70); (2) for failing to object to the State's statements during

closing arguments (*supra* ¶¶ 62-65); and (3) for failing to object to the jury instruction that informed the jury that it could consider the Wisconsin allegations to show defendant's motive and intent (*supra* ¶¶ 57-60). We have already found that the first two claims do not constitute error. The only error that we have found is the jury instruction. However, we find that counsel is not ineffective for failing to object to the jury instruction because defendant was not prejudiced by the instruction. As discussed above, the stipulation was properly admitted at trial to show defendant's propensity to commit sex crimes. The inclusion of motive and intent in the jury instruction was insignificant. In light of this and the overwhelming evidence, defendant was not prejudiced by counsel's failure to object to the jury instruction. *People v. Graham*, 206 Ill. 2d 465, 476 (2003) (if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient).

¶ 75                                    F. Cumulative Error

¶ 76        Defendant contends that cumulative errors deprived him of a fair trial. He references all the errors which he raised above to contend that those errors amount to cumulative error. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). "However, the cumulative errors that warrant such an extreme result must themselves be extreme." *People v. Desantiago*, 365 Ill. App. 3d 855, 871 (2006). "There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue." *People v. Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 77        Of all the issues raised by defendant, we have only found one to amount to error. That error is in the jury instruction regarding the use of C.P.'s stipulated testimony to establish defendant's

motive and intent. We have already found the error does not warrant reversal. Consequently, this individual error cannot constitute cumulative error.

¶ 78                                   G. Sentencing

¶ 79        Defendant argues his sentences are excessive because the court failed to adequately consider his lack of criminal history, educational history, family support, and potential for rehabilitation in mitigation. Given that defendant failed to present any evidence refuting the court's consideration of these factors and the sentences are within the statutory ranges, we find the court did not abuse its discretion in sentencing defendant.

¶ 80        The court's sentencing determination is entitled to great deference and will not be altered absent an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). Generally, we will not substitute our judgment for that of the circuit court as the circuit court had the opportunity to consider defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id.* at 212-13. We presume that a sentence that falls within the statutory range is not excessive. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 27.

¶ 81        Here, the trial court imposed a sentence within the statutory range. Defendant was convicted of four counts of predatory criminal sexual assault of a child. Each offense is a Class X felony carrying a sentencing range of 6 to 60 years' imprisonment. See 725 ILCS 5/11-1.40(a)(1), (b) (West 2016). Those sentences were required to be served consecutively to one another. 730 ILCS 5/5-8-4(d)(2) (West 2016). Accordingly, we presume the sentence is proper and not an abuse

of discretion. *Busse*, 2016 IL App (1st) 142941, ¶ 27. This presumption is only overcome by affirmative evidence showing the court failed to consider the mitigating factors. *Id.*

¶ 82 Defendant does not cite any affirmative evidence to show the court did not sufficiently consider the mitigating factors of his lack of criminal history, educational history, family support, and potential for rehabilitation. To the contrary, the court stated that it considered the factors in mitigation. The court explained that it considered the PSI, which contained the relevant information about defendant's educational and criminal history. The court also considered the character letters submitted on behalf of defendant. However, the court concluded that the factors in aggravation outweighed the factors in mitigation. Therefore, the record establishes that the court adequately considered the relevant factors in mitigation, and it did not abuse its discretion in imposing defendant's sentences.

¶ 83 III. CONCLUSION

¶ 84 For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 85 Affirmed.